UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In re

MENDOCINO COAST RECREATION
AND PARK DISTRICT,

          Debtor.

WESTAMERICA BANK,

          Appellant,

     v.

MENDOCINO COAST RECREATION
AND PARK DISTRICT,

          Appellee.

Case No.  12-cv-02591-JST

**ORDER AFFIRMING MEMORANDUM REGARDING CHAPTER 9 ELIGIBILITY AND ORDER FOR RELIEF**

      Before the Court is a motion by Creditor and Appellant Westamerica Bank (the "Bank") appealing the Order of the United States Bankruptcy Court (the "Bankruptcy Court") overruling the Bank's objection regarding Debtor Mendocino Coastal Recreation and Park District's (the "District") Chapter 9 eligibility.

      At issue is whether the Bankruptcy Court erred in concluding that the District complied with 11 U.S.C. § 109(c)(5)(B)'s requirements for eligibility as a municipal debtor under Chapter 9.  Pursuant to Bankruptcy Local Rule 8102-1, the matter is deemed submitted for decision.  After reviewing the record and briefs submitted by both parties, the Court AFFIRMS the Bankruptcy Court's order determining Chapter 9 eligibility.

/ / /

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.      BACKGROUND

### A.      Factual and Procedural History

For the most part, the facts in this case are undisputed.  See Appellant Opening Brief ("Appellant Brief"), ECF No. 20 at 4:15; Appellee Opening Brief ("Appellee Brief"), ECF No. 21 at 1:21.  In or around April 2008, the District entered into a lease related to a parkland property with a third party that subsequently assigned all of its rights to Westamerica Bank, entitling the Bank to the lease payments.  Appellee Brief, at 5.  The Bank is the District's largest creditor. Appellant Brief, at 3.

On November 17, 2011, the District's Counsel sent by email and mail a "settlement outline and proposal" (the "Workout Proposal") to the Bank's Counsel, describing the District's insolvent financial situation and notifying the Bank that if it could not work out a satisfactory alternative it would file a Chapter 9 bankruptcy petition.  Exh. C to Notice of Appeal, ECF No. 1-5.  The Workout Proposal concluded by proposing three resolutions: (1) transferring the leased property to the Bank in full satisfaction of the lease obligation, (2) paying the Bank $1.1 million in full satisfaction of the lease obligation, or (3) entering into a forbearance agreement.  Id. at 6.  The Workout Proposal did not mention any other creditors, designate classes of creditors, or describe their treatment in a proposed bankruptcy plan.  The Workout Proposal requested a response by December 1 and notified the Bank that if the District received no response it would "assume that negotiations are not feasible and proceed with the Chapter 9 filing."  Id.

On December 10, 2011, having received no response from the Bank, the District's counsel emailed the Bank's counsel asking for a response to the Workout Proposal, stating that the District would "file its Chapter 9 before December 31, 2011 absent some positive indication from the Bank that a workout is possible," and notifying the Bank that it would advise the District's Board on December 14 that a Chapter 9 filing would be necessary if the Bank did not respond by December 13.  Appellee Brief at 5; ECF No. 8-3, Exh. B to Docket Number 18 in the proceeding below.  As the District acknowledges, it wanted to file its Chapter 9 Petition before 2012 because California Assembly Bill 506 ("AB 506"), codified at Ch. 65, Stats. 2011, would then come into effect.  In most circumstances, AB 506 requires a mediated neutral evaluation process between a

2

municipality and its creditors before a municipality can commence a Chapter 9 petition.  On December 21, 2011, the Bank sent a Default Letter ("Default Letter") to the District, which noted the District's past defaults, invoked the default interest rate on the District's indebtedness, stated that "none of the proposals is acceptable to the bank," demanded payment, and reserved the Bank's rights.  Appellant Brief, at 7:6-8:6; ECF No. 8-3, Exh. C to Docket Number 18 in the proceeding below.

The District filed its Chapter 9 voluntary petition (the "Petition") on December 29, 2011. Appellant Brief at 4.  The Bank objected to the Petition on the ground that the District failed to meet the Chapter 9 eligibility requirements in Section 109(c)(5)(B) of the Bankruptcy Code, 11 U.S.C. § 109(c)(5)(B) ("Section 109(c)(5)(B)").  Id.  The Bankruptcy Court overruled the Bank's objection, holding that the Workout Proposal satisfied Section 109(c)(5)(B).  Memorandum re Chapter 9 Eligibility ("Order Below"), Exh. 4 to ECF No 1; No. 11-14625, 2012 WL 1431219 (Bankr. N.D. Cal. Apr. 22, 2012).  The Bank timely sought and received leave to appeal that determination to this Court.

### B.    Jurisdiction

The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a).

### C.    Legal Standard

In District Court, as in the Court of Appeals, "[t]he bankruptcy court's findings of fact are reviewed for clear error, while its conclusions of law are reviewed *de novo*."  In re JTS Corp., 617 F.3d 1102, 1109 (9th Cir. 2010) (quoting In re Strand, 375 F.3d 854, 857 (9th Cir. 2004)).  "Mixed questions of law and fact are reviewed *de novo*."  In re JTS Corp., 617 F.3d at 1109 (quoting In re Chang, 163 F.3d 1138, 1140 (9th Cir. 1998)).  A Chapter 9 petitioner bears the burden of establishing that it has met Section 109's eligibility standards.  Hamilton Creek Metro. Dist. v. Bondholders Colo. Bondshares, 143 F.3d 1381, 1385 (10th Cir. 1998); see also In re City of Vallejo ("Vallejo"), 408 B.R. 280, 289 (B.A.P. 9th Cir. 2009).

## II.    ANALYSIS

Section 109(c) of the Bankruptcy Code provides that "[a]n entity may be a debtor under Chapter 9 of this title if and only if such entity—" (1) is a municipality; (2) is specifically

United States District Court
Northern District of California

3

1    authorized to be a debtor; (3) is insolvent; (4) desires to effect a plan to adjust such debts; and

2        (5) (a)  has obtained the agreement of creditors holding at least a
3                 majority in amount of the claims of each class that such
                  entity intends to impair under a plan in a case under such
4                 chapter;

5        (b)  *has negotiated in good faith with creditors and has failed to
              obtain the agreement of creditors holding at least a majority
6             in amount of the claims of each class that such entity intends
              to impair under a plan in a case under such chapter;*

7        (c)  is unable to negotiate with creditors because such negotiation
8             is impracticable; or

9        (d)  reasonably believes that a creditor may attempt to obtain a
              transfer that is avoidable under section 547 of this title.

10   (Emphasis added).

11       The Bank and the District disagree about whether the District "negotiated in good faith."

12   In the Order Below, at 2:6-17, the Bankruptcy Court identified two lines of authority about

13   109(c)(5)(B)'s requirements.  The less restrictive view, adopted by the editors of Collier, is that

14   the debtor need not attempt to negotiate any specific plan of adjustment.  Id. (citing 2-109 Collier

15   on Bankruptcy ("Collier"), ¶ 109.04[3][e][ii] (16th ed.)).  As the Bankruptcy Court saw the more

16   restrictive view, adopted by In re Cottonwood Water and Sanitation Dist. ("Cottonwood"), 138

17   B.R. 973, 975 (Bankr. D. Colo. 1992) and by dicta in Vallejo, 408 B.R. at 297, the debtor must

18   negotiate over "the possible terms of a plan," "at least in concept."  The Bankruptcy Judge

19   concluded that "the District's attempt to negotiate with the Bank met the requirements for

20   eligibility regardless of which interpretation of § 109(c)(5)(B) is applied," since two of the

21   District's proposals -- transferring the leased property to the Bank in satisfaction of the lease

22   obligation, and paying the Bank $1.1 million in full satisfaction of the lease obligation -- were

23   proposed bankruptcy plans, at least in concept.  Order Below, at 2:19.

24       The Bank characterizes the District's proposals as "out-of-bankruptcy workout

25   alternatives," rather than proposed bankruptcy plans.  Appellant Brief, at 6:19.  But its primary

26   argument on appeal is not that proposals could not be construed as proposed bankruptcy plans.[1]

27   _____

28   [1] Indeed, as Appellant recognizes, practically any proposal to alter a debtor's obligations could
     also be accomplished through a bankruptcy plan.  Appellant Brief, at 18:19-20.

4

United States District Court
Northern District of California

1    Instead, the Bank objects that there are specific requirements contained in the restrictive view that

2    the Bankruptcy Court did not recognize.  See id., at 7:1-14 & 17:4-18:23.  In particular, the Ninth

3    Circuit Bankruptcy Appellate Panel ("BAP") stated in Vallejo that "[w]e emphasize that while a

4    complete plan is not required, some outline or term sheet of a plan which designates classes of

5    creditors and their treatment is necessary."  Id. at 297.  Neither party contends that the District's

6    Workout Proposal is an outline or term sheet that discloses to the Bank the classes of creditors and

7    how their interests would be affected in a Chapter 9 plan.  Although the Bank raised this argument

8    in its objection, the Bankruptcy Court did not discuss this aspect of Vallejo in the Order Below.

9         The Bank identifies Vallejo as the "leading case" on 109(c)(5)(B)'s requirements, and

10   notes that the Bankruptcy Court considered itself at least practically bound by Vallejo's

11   requirements.  But this Court cannot find that the Bankruptcy Judge erred simply for failing to

12   apply a requirement in a BAP opinion.  "BAP decisions cannot bind the district courts" because

13   "the district courts must always be free to decline to follow BAP decisions and to formulate their

14   own rules within their jurisdiction."  Bank of Maui v. Estate Analysis, Inc., 904 F.2d 470, 472 (9th

15   Cir. 1990).  Moreover, the Ninth Circuit has "never held that all bankruptcy courts in the circuit

16   are bound by the BAP."  In re Silverman, 616 F.3d 1001, 1005 (9th Cir. 2010).

17        For very good reasons, bankruptcy courts in this circuit consider themselves bound by their

18   own rules to follow determinations made by the Ninth Circuit BAP, even where those conclusions

19   are dicta.  See Order Below, at 2:17, n. 1 (citing In re Muskin, 151 B.R. 252, 255 (Bankr. N.D.

20   Cal. 1993) and In re Tippett, 338 B.R. 82, 88-89 (9th Cir. BAP 2006).  But in a district court

21   proceeding in which BAP opinions are not controlling precedent, a district court cannot find that a

22   bankruptcy judge committed legal error simply for failing to identify a requirement in a BAP

23   opinion and apply it as precedent.

24        The question on appeal is whether Section 109(c)(5)(B) requires more than what the

25   District did.  To answer that question, the Court must undertake its own de novo review of the

26   Bankruptcy Code.  In doing so, "[t]he starting point for our interpretation of a statute is always its

27   plain language," and to "determine plain language we consider the language itself, the specific

28   context in which that language is used, and the broader context of the statute as a whole."  In re

1   Silverman, 616 F.3d at 1006 (internal citations omitted).

2       The parties have no cited no authority from any Article III court interpreting

3   109(c)(5)(B)'s requirements, and the Court is not aware of any.  However, the Court will "treat the

4   BAP's decisions as persuasive authority given its special expertise in bankruptcy issues and to

5   promote uniformity of bankruptcy law throughout the Ninth Circuit."  In re Silverman, 616 F.3d at

6   1005.  This Court considers the opinions of other bankruptcy courts and leading treatises to

7   provide potentially persuasive analyses, because of their expertise in dealing with the Code.

8       **A.      Requirement to Negotiate Regarding a Bankruptcy Plan**

9       The Court agrees that, "[i]n isolation, the statutory language encompassed in section

10  109(c)(5)(B) is inconclusive."  Cottonwood, 138 B.R. at 975.  It is not possible to determine

11  whether the District's efforts satisfy Section 109(c)(5)(B)'s standard by simply interrogating the

12  isolated words "negotiated in good faith."  And the applicable statutory presumptions and

13  interpretive canons fire at cross-purposes.[2]

14      Much, therefore, turns on the way this phrase is understood in context.

15      The Cottonwood opinion contains the most comprehensive review of Section 109's

16  legislative history.  138 B.R. at 975-79.  When Congress created bankruptcy relief for

---

[2] As the Bank emphasizes, more than one bankruptcy court has concluded that "[b]ankruptcy courts should review chapter 9 petitions with a jaded eye," because "[p]rinciples of dual sovereignty . . . severely curtail the power of bankruptcy courts to compel municipalities to act once a petition is approved."  In re New York City Off-Track Betting Corp. ("NYC OTB"), 427 B.R. 256, 264 (Bankr. S.D.N.Y. 2010); see also In re Suffolk Reg'l Off-Track Betting Corp. ("Suffolk"), 462 B.R. 397, 414 (Bankr. E.D.N.Y. 2011) (citing same).  However, the Tenth Circuit has held that Chapter 9's eligibility criteria "are to be construed broadly to provide access to relief in furtherance of the Code's underlying policies."  In re Hamilton Creek Metro. Dist., 143 F.3d at 1384.  In general, the Supreme Court has indicated that it construes Bankruptcy Code eligibility criteria so as to protect "member[s] of the class of 'honest but unfortunate debtor[s]' that the bankruptcy laws were enacted to protect."  Marrama v. Citizens Bank of Massachusetts, 549 U.S. 365, 374 (2007).  The "'fresh start' purposes behind the Bankruptcy Code" have moved the Ninth Circuit to construe Chapter 7's eligibility criteria broadly.  In re Bernard, 96 F.3d 1279, 1281 (9th Cir. 1996).  But see also Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 51 (2008) (rejecting arguments that a particular Chapter 11 provision should be construed particularly broadly or particularly narrowly, concluding instead that Chapter 11 "strikes a balance between a debtor's interest in reorganizing and restructuring its debts and the creditors' interest in maximizing [value]").

United States District Court
Northern District of California

1   municipalities, municipalities had to demonstrate in writing that a portion of their creditors had

2   accepted the bankruptcy plan.  PL 73-251 (HR 5950), May 24, 1934, 48 Stat. 798.  As of 1946,

3   municipalities had "to come to the court with a 'plan of composition' which had been approved"

4   by creditors owning not less than 51% of the affected securities.  Cottonwood, 138 B.R. at 976; PL

5   79-481, (HR 6682), July 1, 1946, 60 Stat. 410.  In 1976, Congress enacted the predecessor statute

6   to Section 109, which released municipalities from their obligations to obtain the prior consent of

7   their creditors before filing.  PL 94–260 (HR 10624), April 8, 1976, 90 Stat 315.  The 1976 statute

8   instead permitted a municipality to file for bankruptcy, *inter alia*, if it "has negotiated in good

9   faith with its creditors and has failed to obtain, *with respect to a plan of adjustment of its debts*, the

10  agreement of creditors holding at least a majority in amount of the claims of each class which are

11  claims affected by that plan."  Id., § 84 (emphasis added).  "Public Law 94–260 contained a

12  specific provision stating that a "'plan' means plan filed under section 90" [of Chapter 9 of the

13  Bankruptcy Act]," i.e., a Chapter 9 petition.  Cottonwood, 138 B.R. at 977. "Thus, it is clear from

14  the provisions of Public Law 94–260 that a municipality seeking to file a petition under Chapter

15  IX had to have negotiations concerning the 'plan of adjustment' which was to have been the 'plan'

16  to be filed under section 90 of the Act."  Id.

17      In 1978, Congress enacted a comprehensive new Bankruptcy Code that replaced the 1976

18  language with the now-current version of Section 109(c)(5)(B).  PL 95-598 (HR 8200), Nov. 6,

19  1978, 92 Stat. 2549, § 109.  Section 109(c)(5)(B) does not include the previously existing phrase

20  "concerning a plan of adjustment."  It now provides that a municipality may file if it "has

21  negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding

22  at least a majority in amount of the claims of each class that such entity intends to impair under a

23  plan in a case under such chapter."  Id.

24      Collier takes the view that, by removing the phrase, Congress intended to soften the

25  entrance requirements to bankruptcy, and that the statute no longer requires a negotiation over any

26  kind of bankruptcy plan.[3]  Collier, ¶ 109.04[3][e][ii].  In contrast, the Cottonwood court, after

27  

---

28  [3] Collier regards all of Section 109's prepetition requirements to be "virtually meaningless."  ¶ 109.04[e].

United States District Court
Northern District of California

examining records from the legislative history, concluded that the change was a stylistic one that did not alter the municipality's basic obligation to negotiate over the terms of a proposed bankruptcy plan. 138 B.R. at 979. In Vallejo, the Ninth Circuit BAP adopted the Cottonwood view. 408 B.R. at 297. In bankruptcy courts within the Ninth Circuit, this is currently the effective law of the circuit. A near-unanimous consensus of other Bankruptcy Courts have also explicitly held that a municipality must negotiate over the terms of a proposed bankruptcy plan. In re Pierce Cnty. Hous. Auth. ("Pierce"), 414 B.R. 702, 713 (Bankr. W.D. Wash. 2009); In re Sullivan Cnty. Reg'l Refuse Disposal Dist. ("Sullivan"), 165 B.R. 60, 79 (Bankr. D.N.H. 1994); In re Ellicott Sch. Bldg. Auth. ("Ellicott"), 150 B.R. 261, 266 (Bankr. D. Colo. 1992); see also In re NYC OTB, 427 B.R. at 275-76 (Bankr. S.D.N.Y. 2010) (adopting the requirement at least *arguendo* and finding that the requirement was satisfied because the municipality "outlined a plan to creditors where no one would be impaired due to the reorganization").[4] In contrast, neither Collier nor the District cite any Bankruptcy Court decisions which have explicitly taken the position that a municipality need not negotiate over the terms of the proposed bankruptcy plan.[5]

For three reasons, the Court is persuaded by the Cottonwood view that Section 109(c)(5)(B) requires municipalities not just to negotiate generally in good faith with their creditors, but also to negotiate in good faith with creditors over a proposed plan, at least in

---

[4] Together, these cases comprise six of the nine published cases this Court has identified which interpret the requirements of Section 109(c)(5)(B). In two others, the question of whether the municipality is required to discuss its proposed bankruptcy filing was not directly presented, but it appears from the facts that the requirement would have been satisfied. See In re City of Stockton, Cal., 493 B.R. 772, 782 (Bankr. E.D. Cal. 2013) (the municipality presented "a proposed plan of adjustment . . . in which it described how it proposed to deal with the affected parties"); In re Villages at Castle Rock Metro. Dist. No. 4, 145 B.R. 76, 80 (Bankr. D. Colo. 1990) (negotiations with pertinent creditors apparently included discussion of municipality's proposed Chapter 9 petition). In another, Section 109(c)(5)(B) was found satisfied, but it is unclear from the court's discussions whether the negotiations that occurred involved a proposed bankruptcy plan. In re Pleasant View Util. Dist. of Cheatham Cnty., Tenn., 24 B.R. 632, 639 (Bankr. M.D. Tenn. 1982); see also In re McCurtain Mun. Auth., 07-80363, 2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4, 2007) (same).

[5] Norton Bankruptcy Law & Practice says of Section 109(c)(5)(B) that "the extent to which the municipality must attempt to negotiate is unclear from the statute." 1 Norton Bankr. L. & Prac. 3d § 17:8, n.19.

United States District Court
Northern District of California

concept, for bankruptcy under Chapter 9.

First, for reasons persuasively explained in the <u>Cottonwood</u> opinion, the legislative history indicates that the 1978 amendments were not intended to alter the previously existing obligations of municipalities.  138 B.R. at 978.  In particular, it appears that in crafting the current Section 109, Congress generally settled on the Senate's version of the proposed language, which the Senate Report stated was written to "retain . . . the creditor protection provision, requiring a municipality to attempt a good faith negotiation with its creditors before a petition is filed."  <u>Id.</u> The remaining amendments to Section 109 were described as "[s]tylistic changes and minor substantive revisions."  <u>Id.</u>  While courts generally apply a presumption of purposive amendment, <u>see</u> <u>Babbitt v. Sweet Home Chapter of Communities for a Great Or.</u>, 515 U.S. 687, 701 (1985), this presumption does not allow courts to graft onto statutes an intention that Congress appears not to have possessed.  And in dealing with the ambiguous text in the Bankruptcy Code, the Supreme Court has established a presumption that Congress did not mean to alter rules that preceded the Bankruptcy Act of 1978.  <u>See</u> <u>Dewsnup v. Timm</u>, 502 U.S. 410, 417-20 (1992).[6]

Second, even putting aside the legislative history, it is difficult to read the statute as permitting negotiations that are completely untethered from a plan for bankruptcy.  Municipalities must "negotiate[] in good faith with creditors," and they also must show that they have "failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a [bankruptcy] plan."  11 U.S.C. § 109(c)(5)(B).  The structure of the sentence strongly implies that in the negotiations, municipalities are seeking the creditors' agreement *to a bankruptcy plan.*  What other agreement can they be seeking?  If Congress intended only for municipalities to seek forgiveness or debt adjustment from its creditors, it would have been easy enough to say so.  Ultimately, "the negotiations referred to in

---

[6] The Supreme Court has held that "[t]he language of § 109 is not unclear," and that therefore it is inappropriate to resort to legislative history to divine its meaning.  <u>Toibb v. Radloff</u>, 501 U.S. 157, 162 (1991).  In the full context of the <u>Toibb</u> opinion, however, it appears that the Court was referring to specific passages in Sections 109(b) and 109(c), rather than to the entirety of Section 109.  For reasons discussed immediately *infra*, this Court, like many of the bankruptcy courts who have addressed the issue, finds the text of Section 109(c)(5)(B) to be ambiguous.  In any case, this Court would reach the same result even without considering the legislative history.

United States District Court
Northern District of California

1  the statute cannot be separated from its context, which clearly and unambiguously refers to the

2  treatment of impaired creditors under a plan." Vallejo, 408 B.R. at 297.

3          Third, the disclosure of at least some basic information about the imminent bankruptcy

4  filing is key to establishing that the negotiation has been "in good faith." "[B]ecause

5  § 109(c)(5)(B) involves classification and impairment, it would be difficult for a municipality to

6  prove that it negotiated in good faith with creditors it intends to impair unless the municipality had

7  a plan of adjustment drawn or at least outlined when it negotiated with the creditors." Vallejo, 408

8  B.R. at 297. At a minimum, for example, a municipality cannot fail to apprise creditors of an

9  imminent bankruptcy filing and claim to be negotiating in good faith, and neither can it refuse to

10  discuss such a plan as part of the negotiations. Therefore, any negotiation that could be

11  characterized as being "in good faith" would have to involve discussion of a proposed bankruptcy

12  plan.

13          This Court concludes that negotiations satisfying Section 109(c)(5)(B) must revolve

14  around a plan, at least in concept, for Chapter 9 bankruptcy. Like the Vallejo court, this Court

15  "do[es] not mean to discourage or undermine prepetition negotiations with major creditors that are

16  aimed at avoiding bankruptcy altogether with this result." In many cases, negotiations over

17  alternatives to bankruptcy are likely to significantly overlap with, or even be coterminous with,

18  negotiations over the terms of a proposed bankruptcy filing. But in any event, the imminent

19  bankruptcy plan cannot be absent from the conversation.

20      **B.      Negotiation in Good Faith**

21          Vallejo goes a step further than Cottonwood; it states that "some outline or term sheet of a

22  plan which designates classes of creditors and their treatment is necessary."[7] Id. at 297. This

23  conclusion, it should be noted, is dicta within dicta. In addressing Section 109(c)(5), the court did

24  not need to reach the question of whether the municipality satisfied subsection B, since it found

25  that Vallejo satisfied the alternative statutory requirement of subsection C. Id. at 297-99. Even in

26  addressing Section 109(c)(5), the court did not need to address specifically whether an outline or

27  _____

28  [7] For ease of discussion, the Court will hereafter refer to this specific requirement as the "Vallejo rule."

United States District Court
Northern District of California

1   term sheet designating the treatment of creditors was required. "[T]he evidence was undisputed

2   that Vallejo never negotiated with . . . any of its creditors over the possible terms of a plan of

3   adjustment," and so the case fell squarely within the unadorned ambit of Cottonwood. Id. at 297.

4          Since the BAP's mandate is to "provide a uniform and consistent body of bankruptcy law

5   throughout the entire circuit," it is entirely appropriate for it to reach conclusions in dicta, since

6   Bankruptcy Courts within the circuit consider themselves practically bound to apply all of the

7   BAP's reasoned conclusions. Bank of Maui, 904 F.2d at 472 (quoting In re Windmill Farms, Inc.,

8   70 B.R. 618, 621 (B.A.P. 9th Cir. 1987) rev'd on other grounds, 841 F.2d 1467 (9th Cir. 1988));

9   see also Tippett, 338 B.R. at 88-89 (approvingly citing the Ninth Circuit's distinction, in Padilla v.

10  Lever, 429 F.3d 910, 916 (9th Cir. 2005), between reasoned considerations in dicta and casual

11  analyses). However, while Vallejo explains, persuasively, its reasons for adopting the

12  Cottonwood rule, it does not explain in any way why it extends the rule to require "some outline

13  or term sheet of a plan which designates classes of creditors and their treatment." The cases the

14  opinion cited in this passage do not discuss such a requirement. See Vallejo, 408 B.R. at 297

15  (citing Sullivan, 165 B.R. at 78 and Cottonwood, 138 B.R. at 979). In the cases that have

16  subsequently applied this aspect of Vallejo, the lack of a term sheet disclosing the classes of

17  creditors and their treatment was not materially at issue. See NYC OTB, 427 B.R. at 275-76 (the

18  requirement to negotiate was satisfied because the municipality "outlined a plan to creditors where

19  no one would be impaired due to the reorganization"); Pierce, 414 B.R. at 713 ("the only mention

20  of bankruptcy by the Debtor prepetition was statements at . . . [a] mediation suggesting that

21  bankruptcy was an option being considered").

22         The Court sees good reasons to adopt the Vallejo rule as an extremely useful indicium of

23  whether parties negotiated in good faith regarding a bankruptcy plan. Without knowing how other

24  creditors will be treated in a bankruptcy plan, a creditor is in a double-blind, trying to navigate its

25  way out of a prisoner's dilemma. To negotiate in good faith, the municipality must put on the

26  table how its proposed bankruptcy plan would treat creditor classes, so that creditors know whose

27  ox, overall, is being gored. Although, as discussed further infra, this purpose is less important

28  where the creditor is the predominant interest-holder, it is important in many other cases where the

United States District Court
Northern District of California

1   creditor is one of several similarly situated lenders.

2         However, the Bank stretches the <u>Vallejo</u> rule beyond its facts in arguing that the District

3   necessarily had to send such information to the Bank in its first attempt to open the lines of

4   communication for a negotiation.  The City of Vallejo had been negotiating with its creditors for

5   seven months, 408 B.R. at 298-88, and the BAP's observations should be understood in that

6   context.  The <u>Vallejo</u> rule is similar to other decisions by bankruptcy courts analyzing the

7   particular factual patterns of negotiations and deciding whether the municipality's efforts lacked

8   good faith.   For example, in <u>Sullivan</u>, the court found that a municipality had not negotiated in

9   good faith because it had "cho[sen] to ignore clear, unambiguous contractual rights of the other

10  party and, more importantly, refuse[d] to acknowledge or throw into the negotiating equations a

11  large and significant asset that it h[eld]."  165 B.R. at 78.  This Court agrees that such behavior

12  justifies a finding that the municipality has not satisfied Section 109(c)(5)(B).  But it does not

13  follow from this that a municipality is forbidden from filing for Chapter 9 if it fails, in its first

14  outreach effort, to explicitly acknowledge all of its significant assets, clarify that such assets are up

15  for negotiation, and promise not to ignore the creditor's contractual rights.  It would create an

16  unsustainable standard for municipalities if every court-identified hallmark of good-faith

17  negotiation immediately became a front-end requirement in seeking a negotiating partner.  The

18  <u>Vallejo</u> rule is a rule for what must occur in a good-faith negotiation.  It is not a rule for what

19  qualifies as a good-faith effort to begin one.

20        In order to determine what it means to negotiate in good faith, the Court consults other

21  references to "good faith" in the Bankruptcy Code.  See <u>Maracich v. Spears</u>, --- U.S. ---, 133 S. Ct.

22  2191, 2203 (2013) ("[i]t is necessary and required that an interpretation of a phrase of uncertain

23  reach is not confined to a single sentence when the text of the whole statute gives instruction as to

24  its meaning").  The phrase also appears in other sections of the Bankruptcy Code, notably in

25  sections governing the filing of a petition and the confirmation of a plan, such as 11 U.S.C.

26  §§ 921(c) & 1129(a)(3), respectively.  The Ninth Circuit has a "long settled interpretation" of the

27  good faith requirement  in Chapter 11 that contemplates a "totality-of-the-circumstances" analysis:

28  "bankruptcy courts should determine a debtor's good faith on a case-by case basis, taking into

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1  account the particular features" of each plan.  In re Sylmar Plaza, L.P., 314 F.3d 1070, 1075 (9th

2  Cir. 2002); see also id. (stating that as a matter of policy, inflexible *per se* rules "inject

3  unnecessary and undesirable rigidity into the good faith inquiry").

4  The Court also considers how the Section 109(c)(5)(B) process compares to analogous

5  provisions in other chapters of the Bankruptcy Code.  While Chapter 9 filers must conduct

6  prepetition negotiations with creditors, filers under other chapters conduct certain negotiations

7  after a petition is filed.  See, e.g., 11 U.S.C. §§ 1113(b) & (c) & 1114(f)(1) (postpetition

8  negotiations required with unions regarding rejection of collective bargaining agreements in

9  Chapter 11 proceedings).  Norton counsels that "the appropriate standard to apply [under Section

10  109(c)(5)] is one that is "at least as stringent as those under §§ 1113 and 1114."  1 Norton Bankr.

11  L. & Prac. 3d § 17:8, n.19.  Those statutes require courts to, *inter alia*, determine whether the

12  parties "[met] to confer in good faith in attempting to reach mutually satisfactory modifications,"

13  determine whether unions have rejected proposals "without good cause," and "balance … the

14  equities."  11 U.S.C. § 1113(b)(2) & (c).  In doing so, courts commonly assess both parties'

15  conduct in negotiations.  See, e.g., In re Maxwell Newspapers, Inc., 981 F.2d 85, 90 (2d Cir. 1992)

16  (considering "the manner in which [the debtor] made his final offer," and the fact that the union

17  "did not complain that it had too little time to respond," in affirming the bankruptcy court's

18  determination that a union rejected a proposal without good cause).

19  From this body of law, the Court draws two conclusions.  First, courts may consider, based

20  on the unique circumstances of each case and applying their best judgment, whether a debtor has

21  satisfied an obligation to have "negotiated in good faith."  Second, while the Bankruptcy Code

22  places the overwhelming weight of its burdens on petitioners, the provisions that call for

23  negotiation contemplate that at least some very minimal burden of reciprocity be placed on parties

24  with whom a debtor must negotiate.

25  In this case, the negotiation contemplated in Section 109(c)(5)(B) never happened, and the

26  fault for that lies primarily with the Bank.  Had the Bank responded with even the slightest

27  indication of a willingness to negotiate, or even merely requested more time to consider the

28  District's proposal, the door might well be open for it to claim that the District did not negotiate in

13

1  good faith.  But "[j]ust as it takes two dancers to tango, good faith negotiations contemplate

2  reciprocity."  <u>Stockton</u>, 493 B.R. at 793.  Here, the Bank ignored the District's proposal for over a

3  month and then sent a notice of default.  Creditors cannot "take a we-have-nothing-to-talk-about

4  position," and claim that "good faith is a one-way obligation applicable to the [municipality] but

5  not to the [creditors] themselves."  <u>Id.</u>[8]

6        The Court is not persuaded by the Bank's argument that its Default Letter was merely "part

7  of what . . . would have been an ongoing negotiation process common in financial obligations

8  workouts."  Appellant's Reply Brief ("Reply"), ECF No. 23, at 2:16-18.  Nothing in the Default

9  Letter responded to the proposals beyond rejecting them, or expressed any willingness to deal.

10 Given the context, any reasonable observer would consider such a response to be a refusal to

11 negotiate.  It may be common in many negotiations for one party to reject an opening offer out of

12 hand and leave the room.  But when that happens, the offering party is certainly entitled to

13 consider discussions at an impasse, if not at an end.  In other words, the District was permitted to

14 take "no" for an answer.

15        This Court does not mean to undermine <u>Vallejo</u>'s requirement that municipalities provide

16 an outline of classes of creditors and their treatment.  In any negotiation, it is a requirement whose

17 absence will defeat a municipality's claim to have negotiated in good faith over the terms of a

18 bankruptcy plan.  The onus also remains on municipalities to initiate negotiations and make

19 reasonable attempts to follow up.

20        But this case does not present the issue, addressed in <u>Cottonwood</u> and <u>Vallejo</u>, of what

21 must occur in a negotiation that satisfies 109(c)(5)(B).  It presents the issue of what information, if

22 missing from the debtor's first attempt to negotiate, bars a municipality from filing from Chapter 9

23 even if a creditor rejects the overture and declines to negotiate.   In answering that question, one

24 bright-line rule suggests itself.  The possibility of imminent bankruptcy proceeding must be

25 disclosed in the first effort to communicate, in order to ensure that, as the Bankruptcy Court put it

26

27  [8] Admittedly, in <u>Stockton</u>, significant details about the bankruptcy plan's treatment of creditors

28  were, in fact, disclosed.  The underlying point about the nature of good-faith negotiation remains
    sound.

United States District Court
Northern District of California

in the Order Below, the municipality does not "blind-side a creditor by failing to mention that a Chapter 9 filing is contemplated." 3:20-22.

Beyond that, the Court does not prescribe any rigid *per se* rule for what qualifies as a good-faith effort to begin negotiations. That determination will depend on several factors, of which the Court here considers only three. First, the greater the disclosure about the proposed bankruptcy plan, the stronger the debtor's claim to have attempted to negotiate in good faith. A creditor might be justified in rejecting the overture of a debtor proposing a frivolous or unclearly described adjustment plan, but a creditor is less justified in ignoring a substantive proposal.

Second, the municipality's need to immediately disclose classes of creditors and their treatment in the first communication will depend upon how material that information would be to the creditor's decision about whether to negotiate. For example, if a creditor demonstrates that it is one of a handful of similarly situated creditors, and that the treatment of different classes is a material consideration in its decision about whether and how to negotiate, it may need to know as soon as possible where it will sit relative to its peers. But if a creditor does not demonstrate why the treatment of classes of creditors is material information and why the lack of such information is prejudicial to its interests, its need to immediately know that information in the first communication is less compelling. The <u>Vallejo</u> rule is intended to further Section 109's purposes of encouraging meaningful prepetition negotiations. It is not intended to require a perfunctory exercise or provide a purely technical ground on which an objector can obstruct a filer's access to bankruptcy. A judicially imposed requirement of that nature would not be in keeping with the "'fresh start' purposes behind the Bankruptcy Code." <u>In re Bernard</u>, 96 F.3d at 1281.

Third, the creditor's response, and the amount of time the creditor has had to respond, may also be factors. If a creditor has had a relatively short time to respond to the municipality's offer to negotiate, a lack of detail in the opening communication might weigh against a municipality rushing to file. On the other hand, where a creditor has been apprised of the possibility of a debt adjustment and declined to respond after a reasonable period of time, or where the creditor has explicitly responded with a refusal to negotiate, its position as an objector is significantly

weakened.[9]

In this case, these factors do not favor the Bank's position. The Bankruptcy Court recognized that the Workout Letter made "quite specific . . . proposal[s] of a plan in concept." Order Below, at 2:8-9, 2:18-19. The Bank has not demonstrated why being apprised of information about proposed classes of creditors in the Workout Proposal would have changed its decision about whether to negotiate with the District. Notably, the Bank did not seek any information about the treatment of other creditors in response to the Workout Proposal, choosing instead to send the Default Letter. The Bank describes itself as the District's "principal creditor," and the amount it claims to be owed dwarfs the amount the District apparently owes to other creditors. Appellant Brief, at 3-5, and citations to the record therein. The Bank makes much of the fact that it did not know whether it would be classified in the class of unsecured creditors or whether it would be in its own class, but it does not demonstrate why that difference would be so material that it needed to know that information in the District's first effort to communicate or, indeed, why it would be material at all. Reply, at 3:11-4:10, 7:8-8:8. And, as discussed more fully *supra*, the Bank responded to express a refusal to negotiate, rather than a counteroffer, a willingness to talk, or even a request for more time.

The Court is mindful that this area of the law is still in development and does not profess to define a rule to encompass all cases. This Court holds only that, on the facts presented here, where a municipality has disclosed to a creditor the possibility of an imminent bankruptcy petition, where the debtor has proposed a substantive plan in concept for how that creditor's rights could be adjusted, where the creditor has made no showing that the absence of information about the proposed classes of creditors and their treatment is material to the creditor's decision over whether to negotiate, and where that creditor sends a response that a reasonable observer could only construe as a refusal to negotiate, that same creditor may not object that the municipality has failed to satisfy Section 109(c)(5)(B) simply because the municipality failed to send an outline of

---

[9] Even when a municipality feels that these factors favor its position, better practice in every instance is for it to disclose as much as it knows about its proposed bankruptcy plan at the earliest reasonable opportunity.

United States District Court
Northern District of California

1    proposed classes of creditors and their proposed treatment in its first attempt to negotiate.

2    **C.**      **Sections 109(c)(5)(A) and (D)**

3       Since the Court will affirm the Order Below on the grounds that the District satisfied the

4    requirements of Section 109(c)(5)(B), the Court need not address the District's alternative

5    arguments that it is also eligible to file for Chapter 9 pursuant to Sections 109(c)(5)(A) and

6    109(c)(5)(C).

7    **V.**      **CONCLUSION**

8       For the foregoing reasons, the Bankruptcy Court's order is AFFIRMED.

9       **IT IS SO ORDERED.**

10    Dated: September 27, 2013

11

12                    JON S. TIGAR

                     United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States District Court*
*Northern District of California*